Bouldin, J.
The question in this case (on the merits) grows out of the construction of that clause of the codicil to the will of William Womack, deceased, in which, after directing an equal division of the residue of his estate among his children, Francis Jefferson, James Madison, Uancy, Susan and Mary C., to them, their heirs and assigns forever, he qualifies the provision for Mary C. as follows: “Except my daughter Mary C.; and her portion, after deducting forty-nine dollars, I lend unto her during her life, and after her death I give the same to the lawful issue of her body, to them and their heirs and assigns forever.” The question is, what estate did Mary C. take in the residuum under this clause.
The codicil was executed in 1830 or 1831, and was admitted to probate in 1831; and the clause in question brings again before the court for consideration the application and effect of the oft-recurring and much tortured rule in Shelley's case. The question has been carefully and ably argued by appellant’s counsel; but it is not my purpose to enter upon an examination of the cases in which it has arisen; for, as was well said by Lord Eldon, in Jesson v. Wright, “the mind is overpowered by their multitude, and the subtlety of distinction between them.” I shall not, therefore, at this late day undertake to discuss the question; but for an able and exhaustive investigation of this and kindred questions, beg leave to commend to the bar and curious *72 enciuirers> the very powerful arguments of counsel in Moon v. Stone, 19 Q-ratt. 130; which for pains-taking industry and thorough research have rarely, if ever, , ,, , , -, , been equalled, and never surpassed, by any argument before this court.
I think I may assume, as a proposition too plain to be questioned, that the words used in the testator’s will, “I lend to my daughter Mary C. her portion during her life, and after her death I give the same to the lawful issue of her body,” are, when used in a will, standing alone, apt and appropriate words, under the rule, to create an estate tail in Mary 0. as to the realty, and an absolute estate as to the personalty. The question supposed to be debateable is, whether the application of the rule is defeated by the superadded words of limitation, “to them and their heirs and assigns forever:” whether these words plainly indicate the purpose of the testator to provide for a new stock to take by purchase. The contrary has been held by a decided majority of the cases. It must be conceded, however, that there was at one time much conflict in the cases, both in England and America, as to the effect on the rule of such words, and others o± like character. See the English cases on the subject as collected and classified by Mr. Hayes in his excellent treatise, 7 Law Libr. p. , tables 1, 2, 3 and 4, where all the cases will be found. In the case of Jesson v. Wright, above cited, decidéd by the House of Lords, in 1820, the whole subject was fully considered, after an elaborate argument at the bar, in which Lord Eldon said: “Ho ease was ever better argued at this bar;” and words appropriate to create a tenancy in common, superadded to words creating’ an estate tail, were disregarded as repugnant to the *73 previous words of limitation; and the rule was strictly applied.
This decision was regarded at the time as settling the law of England in favor of a rigid application of the rule as settled by the earlier cases, regardless of such superadded words of limitation; and in that sense it was adopted and approved by this court in the ■case of Moore v. Brooks, 12 Gratt. 135. Judge Allen ■delivering the opinion of the majority of a full court in that case, says, p. 146: “Several eases have occurred since the case of Jesson v. Wright, and although in some instances the principle of that case may not have been followed out, yet the weight of authority is in favor of the rule there announced. The cases on this subject are reviewed in 2 Jarmin on Wills 271, ch. 37, and he concludes that the doctrine of Jesson v. Wright has prevailed, and stands on the soundest principles of construction. Hayes on Estates Tail 100, 7 Law Libr. 54, sustains the same proposition. See also to same effect, Powell on Devises 464, ch. 23, 22 Law Libr. 245.” And at p. 154, same case, Judge Allen concludes his opinion as follows: “I also think that the cases in this court are not in harmony with each other, and that it would be more in conformity with the spirit of the later,'as well as of the earlier cases in this court, and the true doctrine in regard to the rule in question, to hold that the superadded expressions do not clearly indicate an intention to use the terms as descriptive of any other class than heirs.”
I think the case under consideration is ruled by the principle of the cases of Jesson v. Wright and Moore v. Brooks. It is true that the superadded expressions here are not the same used in the cases referred to; but I regard the principle established by those as ruling *74 this. In the cases referred to, the superadded words would create a tenancy in common, whilst here they amount to a limitation in fee; but neither are suffi- • cient to take the previous limitation out of the operation of the rule, as the cases show. In 1822, in the case of Tidball v. Lupton, 1 Rand. 194, Judge Roane held it to be unquestionable, that an estate tail' would be created by words the same in effect, and, indeed, almost identical with those we are considering. By the first clause of the testator’s will in that case, he devised the premises in question to his daughter, “ Hannah Lupton, and to her and the heirs of her body, and to them and their heirs and assigns forever.” Here, the language is, “ to the lawful issue of her body, to them and their heirs and assigns forever.” The superadded words of limitation are identically the same in both cases. Judge Roane held that these superadded expressions were not sufficient to show an intention-on the part of the testator, that the heirs of Hannah Lupton should take by purchase as a new stock and not by limitation. He says, p. 204: “I am clearly of opinion that if there were nothing else in this will than the first clause, Hannah Lupton took an estate tail in the premises.”
It is proper to add, that I have cited this opinion of Judge Roane, to show his individual views of the law on the question under consideration. His construction of the first clause was fortified by another clause; and the decision did not rest on the first clause alone. His views of the question, however, are in accord with a majority of the cases.
I am of opinion therefore that the testator’s daughter, Mary 0., took an absolute estate in the slave Martha, and that the bill in this case should have been dismissed on the merits.
*75 But were this otherwise, my opinion is that the claim is purely a legal one, that the plaintiff in the court below showed no good reason for going into a court of equity, and that his bill should have been dismissed for want of jurisdiction. The only color-able ground for equitable jurisdiction is the following allegation: “ That the said slave Martha is still in the possession of said Hall, and has several children, whose names are unknown to your complainants, and the said Hall refuses to make any disclosure, or give them any information on the subject. The prayer, it is true, is for a disclosure by Hall of the names and number of Martha’s children, whether any had been sold, and if so to whom, and what was their value, that an account of hires might be taken of the slaves, and their profits decreed to them, and for general relief. But it will be observed that the only matter of which the complainants allege ignorance in the charging part of the bill was the names of the children, not their number; and they no where allege that they had no means of ascertaining the names except by a discovery from Hall. The answer alleges that the defendant, Hall, had never sold any of the slaves, and denies that he had “ refused to state the number and the names of the children, further than to say that he did not know the names of all, as he does not now. The number he has always stated when called on, and the names might at any time have been obtained by inquiring at his house; and there was no obstacle to their proceeding at law, which they might not by common diligence have removed.”
Ho evidence was taken on either side, and the question is, “ Was there proper ground shown for coming into a court of equity to assert the legal title to the slaves in controversy ?”
*76 The Prin°iple by which we should be governed in responding to this question, was very clearly laid down by Judge Baldwin, speaking for the court, in the case of Armstrong v. Hunton, 1 Rob. R. 323, 326-'7; and has been approved by this court in the recent case of Childress v. Morris, decided at Staunton, 23 Gratt. 802. Judge Baldwin said: “It is perfectly clear as a general rule, that in a bill to substitute an equitable for a legal forum, a prayer for a discovery, without any averment showing its materiality or necessity, is naught. If this court has tolerated a departure from this rule in regard to slave property, (Gregory’s adm’or v. Marks’ adm’or, 1 Rand. 355,) it is when the necessity for a discovery was supposed to be incidental, at least prima facie, to the nature of the demand; as where the suit is to recover a stock of slaves, after a considerable lapse of time, and there has been such an increase as to raise a fair presumption that the plaintiff is ignorant of their names, ages and residences. But even under such circumstances, if it may be inferred from the statements in the bill, or the evidence in the cause, that no such difficulty in point of fact exists, a court of equity will not take cognizance of the case unless there be some other ground for the exercise of its equitable jurisdiction.” Citing Hardin’s ex’ors v. Hardin, 2 Leigh 572. See also Jones v. Bradshaw, 16 Gratt. 355, and Hale &c. v. Clarkson &c., to be reported 23 Gratt. 42, where this qualification of Judge Green’s doctrine in Marks v. Gregory is approved. I think it perfectly apparent from the bill and answer in this case—and there is nothing else— that there existed, in point of fact, no difficulty on the part of the complainants in reaching the facts of their case at law;, and there was no ground or necessity for -a discovery. They allege in the bill ignorance of but *77 one fact, and that an unimportant fact, the names of the slave Martha’s children. They do not pretend that they are ignorant of their number or residence, or that they believe that any of them have been sold. The prayer on that subject is purely colorable. Whilst, on the other hand, the defendant swears positively that he had informed them of their number, that none of them had been sold, and that they were all still in his possession. They knew the name of the mother, for they name her in the bill; and we have a right to infer from the pleadings that they knew also the number of her children; and the conclusion is almost irresistible from the whole, that they could, without difficulty, have ascertained their names, if deemed important.
But it was not at all necessary to know the names of the children to maintain a suit at law for them. An action of detinue could have been maintained for the slave Martha and her six children, without setting forth their names, and a jury could readily and easily have ascertained their value and hires. The ground alleged for coming into a court of equity was colorable only, and my opinion is that the bill should have been dismissed for want of jurisdiction.
On both grounds I am of opinion that the decree of the Circuit court is erroneous, and should be reversed with costs to the appellant; and a decree should be entered dismissing the bill with costs to the defendant in the Circuit court.
The other judges concurred in the opinion of Bouldm, J.
Decree Reversed.